## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION – CINCINNATI

DARREN BROWN,      :  Case No. 1:19-cv-674
             :
    Plaintiff,     :  Judge Matthew W. McFarland
             :
    v.       :
             :
QUEEN CITY SUPPLY COMPANY  :
d/b/a MQ AUTOMATION,    :
             :
    Defendants.   :

---

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 22)

---

This matter is before the Court on Defendant Queen City Supply Company d/b/a MQ Automation ("MQ")'s motion for summary judgment. (Doc. 22.) Plaintiff filed a response in opposition (Doc. 27), to which MQ filed a reply (Doc. 30), making this matter ripe for review. For the reasons below, MQ's motion is **GRANTED IN PART** and **DENIED IN PART**.

### FACTS

MQ, a supplier of high quality specialized industrial tools and products, hired Plaintiff Darren Brown in 2011. Brown initially worked as an engineer and was paid on a salary basis. Two years later, Brown transitioned to a sales role ("Territory Manager") so he could earn more money. The essential job functions of a Territory Manger include building and maintaining relationships with MQ's current customers, identifying/ developing relationships with new customers, and meeting with customers to make

sales and service existing contracts. Meeting with customers face-to-face was required. On average, Brown had 10-15 such meetings each week.

Based on the record, it appears that Brown was good at his job. And by April 2018, he was confident he could make more money if he worked on a full-commission basis—an option MQ offered to all its sales employees. So, later that month, Brown started getting paid exclusively on commission and immediately began earning higher compensation.

However, on July 16, 2018, Brown was scheduled to have an in-person meeting with a customer. Just before it was set to take place, Brown texted his supervisor, Dean Valvano, and asked if he could cover for him because he was having a "medical issue." Valvano said yes but asked if he could call Brown to see what was going on. During the call, Brown told Valvano that he couldn't meet with the customer because he was experiencing a high level of anxiety and needed a couple days off work to get his anxiety under control. (Brown planned to see his doctor, Dr. Pete Scheidler, and get back on medication.) MQ approved his request and granted him paid time off work. Prior to this, Brown had never requested any type of accommodation and had never disclosed to anyone at MQ that he had anxiety or any other disability.

Later that day, Valvano texted Brown, "after you have seen your doctor and the medicine is working, I would like to meet with you." (Doc. 17-3.) Brown emailed back the next day and stated that he was still not feeling well. Valvano forwarded the email to MQ's president, Keith Chabut. According to Chabut and Valvano, the two of them then met to discuss possible accommodations MQ could make for Brown. Chabut

2

recalls that the discussion was focused on "how we can help him." (Doc. 18, p. 95-97; Doc. 19, p. 119.) Brown, however, denies that this discussion ever occurred.

Valvano texted Brown again the next day and asked, "how are you feeling, are you able to meet tomorrow?" (Doc. 17-3.) Brown responded that he was "better but freaking out about meeting with you." (*Id.*) Valvano reassured Brown to "not think negative, MQ needs you healthy and you need to be healthy. However, I want to talk with you when you['re] feeling better and can think clear." (*Id.*) When they eventually spoke over the phone later that evening, Brown explained what his condition was—generalized anxiety disorder (GAD)—and the factors that triggered it. When Brown experienced "episodes," he would have difficulty with certain normal life activities, such as interacting with people, and would avoid social interactions until he could build up his serotonin levels. Brown followed up by texting Valvano a generic internet definition of "social anxiety disorder." Valvano thanked Brown for the details and told him "when you['re] ready[,] we need to meet and get you back [to] MQ[,] if tomorrow is too fast, let's meet on Monday." (*Id.*) Brown said he would stay home the rest of the week and take vacation days, but Valvano responded, "don't worry about that" and to take sick days. (*Id.*) Valvano offered to meet with Brown at a restaurant near Brown's home. Brown chose to meet at a local saloon the next day ("July 20th Meeting").

The parties, however, have different recollections of what all was said during the July 20th Meeting.

In MQ's eyes, the purpose of the July 20th Meeting was for Valvano to meet with Brown in person and discuss possible accommodations that would permit him to return

to work.  (Doc. 18, p. 100; Doc. 19, p. 126-127.)  According to MQ, Chabut and Valvano met prior to the meeting to discuss what some accommodations might be.  Chabut made it clear that he "did not want to lose [Brown]."  (*Id*.)  So, they discussed possibly creating a new position that would suit Brown and his particular needs.  Chabot recalls that the new position was to be presented to Brown as "Hey, let's talk about the position that we're creating for you.  Let's find a way to make it work together."  (*Id*., 135-136.)  When Valvano and Brown eventually met on July 20th, Valvano recalls discussing a variety of topics and encouraging Brown to continue seeking medical help.  Valvano explained that MQ was "trying to collaborate here as a team" and that the whole group just wanted to find a way to get him back to work.  (Doc. 18, 101-112.)  Valvano brought up the possibility of Brown taking on a new position in which he would work as an engineer but still assist the sales team.  This would limit Brown's direct interaction with customers, which MQ hoped would alleviate his anxiety.  Valvano testified that he was simply "presenting ideas," and that he clearly presented the position as merely an "opportunity" or "option."  (*Id*.)  Brown, however, got upset and abruptly ended the meeting without making any suggestions.

Brown has a different recollection of the meeting.  In his eyes, the purpose of the meeting was for MQ to formally demote him.  Brown denies that Valvano offered him the "option" to stay in his Territory Manager position, or that Valvano ever stated the new position was an "opportunity," "proposal," or anything similar.  (Doc. 27, p. 52-3.)  Rather, Brown recalls that Valvano stated, "You are being moved to engineering, per Keith [Chabut], to help with your anxiety," and then allegedly showed Brown a text

4

message from Chabut indicating as much. (Doc. 17; Doc. 25.) Valvano denies that the text message from Chabut was a directive that Brown had to take the new position. Instead, Valvano asserts that he merely showed Brown the text to make him feel comfortable and to demonstrate that the entire team, including MQ's president, was trying to be collaborative and get Brown back to work. Regardless, Brown got upset and expressed his displeasure, explaining to Valvano that he had spent years building up his sales, improving his skills, transitioning accounts, and increasing his pay—particularly under his new commission structure.

Over the course of the next week or so, Valvano and Brown exchanged a series of texts and emails. (*See* Docs. 17-3, 17-9, 19-13, & 19-14.) Brown expressed his frustration about leaving his sales role but also showed interest in the new position. On Sunday, two days after the meeting, Valvano texted Brown to ask how he was doing. Brown responded: "Horrible . . . job position change put me over the edge. Cant sleep, cant eat, cant function. [Dr.] Pete [Scheidler] wants me to check into hospital but I'm hoping things clear up." (Doc. 17-3.) Valvano replied, "Please listen to Pete, he is a Dr. and [y]our good friend." (*Id.*) Brown emailed Valvano the next day and informed him that his anxiety was still an issue. He asked Valvano if it would be best to take vacation days or FMLA since his anxiety was still an issue. MQ provided Brown with details about how to obtain short term disability, which he applied for and was granted. Brown also asked Valvano for the details of the new engineering role, including "pay struct[u]re, responsibilities, health care, expenses, bonus structure, and other pertin[e]nt details." (Doc. 19-13.) Valvano responded that he would "be meeting with Bob [Meyer]

5

and Keith [Chabut] to define the pay structure and all the details relating [to] this

position" and that he would send the additional information after meeting with them.

(Doc. 18-2.) Later that day, Brown emailed Valvano the following:

> I've accepted the fact that I will go back into an engineering role and am excited to hear the details of the position. I am a employee that only wants to do my best to make MQ successful. With that said I also believe that my sales numbers speak for themselves . . . I would love to continue my role in sales but maybe I don't have all the information and you and Keith (Chabut) know best . . . I appreciate all the efforts and opportunities that MQ has given me and I sincerely apologize for not meeting your expectations.

(Doc. 19-14.)

Valvano emailed Brown the next day and asked, "[t]o try and determine when

you['re] coming back, I assume all this week, are you taking next week?" (Doc. 17-9.)

Brown responded that he hoped to be back the following week but then added that

"[t]his has really crushed me . . . I know it's out of your hands but I truly believe I am a

good salesman that builds great relationships with my customers." (*Id.*) Valvano

responded that MQ had "created a new position as the lead application engineer"

("LAE") and that he "would have better details coming." (*Id.*) Valvano texted Brown

and asked if he was available to "meet and discuss your new role? Or do you need time

to yourself as vacation[?]" (Doc. 17-3.) Brown responded that he was a "mess" but

requested that Valvano email him the details. (*Id.*)

The following morning, Valvano emailed Brown that "[s]tarting July 30th, 2018,

the following pay and new position take effect. You will report to Henry Knight and

you will be the lead application engineer. This role is not completely defined but is a

key position for outside sales and internal projects." (Doc. 18-3.) Valvano indicated

that the pay would be "105k yearly, ($2019.20 weekly gross)." (*Id.*) This was higher than Brown's prior base salary of $83,000, but less than what he had earned (on average) during the three months he worked fully on commission ($12,071 per month). Brown and Valvano spoke over the phone about the position again the next day. Afterwards, Brown texted Valvano, "[t]hanks for letting me vent today . . . I will turn it around and be positive." (Doc. 17-3.) Valvano responded, "I am glad to call but we really should do that in person it's a lot easier to have conversation with that in-depth of meaning then doing it over the phone." (*Id.*)

At this point, Brown had been out of the office for two weeks and it was not clear when he would be able to return. His absence was starting to affect both his and MQ's work performance. On July 26, an MQ employee emailed Brown to follow up on the status of an order. Brown responded by apologizing and stating that he could not complete the work. Later that day, a customer emailed Brown with reference to a voicemail he had left Brown asking for a quote. Brown forwarded the email to another MQ employee, stating "I can't get to this today." (Doc. 17-13.) On July 27, Valvano asked Brown if he would be able to cover a demonstration with a customer. Brown didn't respond for two days, only to reply that he would not be able to. On July 30—the day he was supposed to start his new LAE position—Brown emailed MQ asking for additional time off because he was still having medical issues. So, on July 31, Valvano sent a letter to Brown again outlining the proposed new position. A new start date was set for August 6, but it was unclear whether Brown would return on that date since his short-term disability began as of July 29. Valvano therefore asked Brown to forward

customer information to Keith Chabut and himself "so we can address customers' requests while you are out of the office during this time period." (Doc. 17-11.)

Crucially, on August 13, Brown emailed MQ that his anxiety was still not under control and that he required an additional unknown amount of time off work. Keith Chabut responded by sending the following email:

> Darren,
> Your next payroll check will reflect the remaining (1) day of vacation and (1) day of sick pay. Dean Valvano will be calling you to arrange the retrieval of company property laptop, account files, catalogs, etc.[,] given the need to move our business forward.
> Sincerely,
> Keith.

(Doc. 17-15.) Brown contends that, by sending this email, MQ terminated his employment. MQ argues that the email was not intended "in any way" to be an adverse employment action; MQ just needed Brown's computer and files to make sure customers were being taken care of. (Doc. 22 at p. 17-18.)

Five days later, MQ provided Brown with a payroll check that included his one remaining sick day and one remaining vacation day. But it did not include the remaining commission payments Brown was owed from his Territory Manager position. So, Brown sent a text in a group chat with Valvano and Chabut, asking, "[m]y commission check did not get deposited . . . is there an issue with it?" (Doc. 19-24.) When Brown did not receive a response, he followed up by asking, "Really? You think I won't return company property . . . wow. I was waiting to get commission check before returning . . . 2 way street." (*Id.*) Chabut responded, "It's simple Darren. Your check is immediately available upon returning company property." (*Id.*) Brown responded:

8

Your property is available when I get paid . . . you have given me no reason to trust you at this point. I did everything you asked of me and worked for the same payrate for 6 years. I finally start making money I deserve and YOU fucked me. I had a little stress in my life and needed to cope with it . . . BAM . . . 30,000.00 pay cut and a position that will fail.

(*Id.*) Chabut reiterated that Brown would receive his commission check once the company property was returned and, ultimately, Brown received his commission check.

The next correspondence between the parties occurred on August 20, 2018 when MQ received a letter from Brown's attorney. The letter was titled "Darren Brown's Demand for Compensation as a Result of Discrimination," and instructed MQ to direct all further communications regarding Brown through counsel. (Doc. 17-7.) What followed was a series of letters and emails exchanged between MQ's counsel and Brown's counsel. (*See* Docs. 17-17 — 17-23.) MQ asserts that this correspondence establishes that MQ offered Brown his sales position back once he was released to return to work by his doctor, that Brown refused to do so and, instead, accepted another position with a competitor. Brown, however, argues that the correspondence was made during settlement negotiations and thus inadmissible under Fed. R. Evid. 408.

Regardless, the following facts are all undisputed. Brown's doctor (who is Brown's neighbor and friend with whom he regularly texts) informed MQ that Brown could not work from July 16, 2018 through September 25, 2018 because his anxiety made him "unable to perform any job duties" and "unable to function with daily activities." (Doc. 17-24.) Brown was released to work by his doctor "without any restrictions" on September 24, 2018. (Doc. 17-19.) MQ offered Brown his sales position back and Brown was aware that MQ expected him to begin work on September 24,

2018. (Doc. 27, ¶¶ 98-100.) Yet Brown chose not to. Instead, Brown had been interviewing with a competitor, Misumi, who ultimately gave him a job offer on August 29, 2018. (Doc. 17, p. 47-50.) Brown accepted. And on the same day MQ expected him to return to work in the same position he had previously held for years, Brown began full-time employment with one of MQ's competitors.

Brown sued MQ in August 2019 for disability discrimination.

## LAW

Courts must grant summary judgment if the record "reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(c)). Once the movant has met its initial burden of showing that no genuine issue of material fact remains, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To do so, the nonmovant must present "significant probative evidence . . . on which a reasonable jury could return a verdict" in their favor. *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009). The court "must view the facts and any inferences that can be drawn from those facts . . . in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007). This requirement, however, does not mean that the court must find a factual dispute where record evidence contradicts wholly unsupported allegations. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (*citing Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

## ANALYSIS

The Americans with Disabilities Act ("ADA") prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees, employee compensation . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA's definition of "discrimination" also includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C. § 12112(b)(5)(A). Moreover, "under the ADA, an employer must engage in an informal, interactive process with the employee to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Kirilenko-Ison v. Bd. of Educ. of Danville*, 974 F.3d 652, 669 (6th Cir. 2020) (cleaned up). "Even though the interactive process is not described in the statute's text, the interactive process is mandatory, and both parties have a duty to participate in good faith." *Id.*; *see also* 29 C.F.R. § 1630.2(o)(3) (describing the interactive process).

Brown alleges four such claims here.[1] First, that he was wrongfully demoted on July 20th because of his disability. Second, that he was wrongfully terminated on August 13th because of his disability. Third, that MQ failed to provide a reasonable accommodation/engage in the interactive process following his initial panic attack on

---

[1] Although Brown brings each claim under both the ADA and the Ohio Civil Rights Act, ORC § 4112, *et seq.*, his state and federal claims are analyzed together. *See Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 368 (6th Cir. 2013) ("disability claims brought under Ohio law may be evaluated concurrently and under the same standards as claims brought under the ADA.").

July 16th. And fourth, that MQ failed to provide a reasonable accommodation/engage in the interactive process by terminating him on August 13th.

MQ now moves for summary judgment on all four counts, each of which is discussed below in chronological — rather than numerical — order.

## I. Failure to Accommodate/Engage in the Interactive Process (Count III)

In Count III, Brown alleges that MQ violated the ADA and Ohio law by not allowing him to return to his former Territory Manager position following his initial request for leave. On July 16th, Brown "request[ed] a period of time where he was not required to speak with customers." (Doc. 1, ¶ 52.) He argues, however, that MQ "failed to provide a reasonable accommodation by not allowing [him] to return to his original position of employment following his medical leave [on July 23rd]." (*Id.*, ¶ 55.) He also contends that MQ failed to engage in the "interactive process." (*Id.*, ¶ 54.)

The parties agree that to establish a failure-to-accommodate claim, Brown must demonstrate that: (1) he was disabled within the meaning of the ADA; (2) he was otherwise qualified for the position and could perform the essential functions of the job, with or without reasonable accommodation; (3) MQ knew or had reason to know about his disability; (4) he requested an accommodation; and, (5) MQ failed to provide the requested accommodation.[2] Brown cannot do so for two main reasons.

---

[2] *See* Doc. 22 at p. 32 (*citing Johnson v. Cleveland City Sch. Dist.*, 443 Fed. Appx. 974 (6th Cir. 2011); *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004)); and Doc. 27 at p. 20 (*citing O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605, 614 (6th Cir. 2020)). *But see Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007); *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020) (since failure to accommodate claims under the ADA necessarily involve direct evidence, the *McDonnell-Douglas* burden-shifting framework does not apply and courts should instead use the direct evidence test).

First, Brown bears the burden of showing that he was "otherwise qualified" to return to the Territory Manager position. *See Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011). To do so, he must demonstrate that he could "perform the essential functions of the job, with or without reasonable accommodation." *Id.* at 983 (*citing* 42 U.S.C. § 12111(8)).

The parties agree on what the essential functions of a Territory Manager were, which included (among other things) meeting with clients face-to-face. (*See* Response to Proposed Undisputed Facts, Doc. 27, p. 44 at ¶¶11-14.) Brown argues that he was able to perform those functions "without accommodation." (Doc. 27, p. 28, 32.) MQ argues that "[t]he record evidence establishes the opposite." (Doc. 30, p. 18.) As the Sixth Circuit has held, "in cases in which the plaintiff is claiming to be qualified to perform the essential functions of the job without reasonable accommodation, and the employer's defense is that the employee's [disability] precludes satisfactory job performance, objective evidence will suffice to establish the fact in question; namely whether the employee's [disability] renders him or her unqualified to perform the essential functions of the job." *Gearhart v. E. I. du Pont de Nemours & Co.*, 833 F. App'x 416, 423 (6th Cir. 2020) (citations omitted). "[T]o survive summary judgment," Brown is thus "required to point to objective evidence sufficient for a reasonable jury to find that, despite his [generalized social anxiety], he could [meet with clients in person] without an accommodation." *Id.*

However, it is undisputed that—from July 13th through late September—Brown needed time off work because his anxiety prevented him from meeting with customers

13

in person.  Since Brown readily admits that meeting with customers in person was an

essential function of a Territory Manager, (*see* Response to Proposed Undisputed Facts,

Doc. 27, p. 44 at ¶¶ 11-14), it is apparent that Brown's disability prevented him from

being able to perform an essential job function.  Yet perplexingly, and without citing

any evidence, Brown asserts that, as of "July 20, 2018 — he did not need any additional

accommodations.  Had MQ simply allowed [him] to return to his Territory Position on

Monday, July 23, 2018, he would not have needed any other reasonable accommodation

for his anxiety."  (Doc. 27, p. 32; *see also* p. 21 & 28.)  However, "a plaintiff's

uncorroborated belief in his physical prowess is not enough to counter affirmative

evidence to the contrary."  *Johnson*, 433 F. App'x at 986 (citations omitted).  And here,

Brown provided MQ with a note from his primary care physician instructing that he be

off work from July 16, 2018 to September 25, 2018 because he "has a diagnosis of

general anxiety disorder [and] is unable to perform any job duties and is unable to

function with daily activities while in this state."  (Doc. 17-24, p. 8.)  How could Brown

have performed the essential functions of a Territory Manager on July 23rd when his

own doctor dictated that he was "unable to perform any job duties" during that same

time?  The answer is simple:  he couldn't.  When faced with this precise scenario, the

Sixth Circuit has repeatedly held that a plaintiff cannot perform a task that their doctors

have indicated they are incapable of performing — regardless of the plaintiff's

confidence in their own capabilities.  *See Johnson*, 443 Fed. Appx. at 984-989 ("doctors'

restrictions must be taken at face value and . . . [plaintiff] could not perform a task that

her doctors indicated she was incapable of safely performing.") (*citing Manigan v.*

14

*Southwest Ohio Regional Transit Auth.*, 385 Fed.Appx. 472, 478 (6th Cir.2010) (although Plaintiff "argues that he could perform his job with or without reasonable accommodation . . . Any such argument would fail, however, in light of his doctor's restrictions.")); *see also Boback v. Gen. Motors Corp.*, 107 F.3d 870 at *3 (6th Cir. 1997); *Gearhart*, 833 F. App'x at 423.

In short, Brown's "uncorroborated belief" that he could return to work on July 23rd without accommodation "is not enough to counter [the] affirmative evidence to the contrary." *Johnson*, 443 F. App'x at 986 (cleaned up). And here, the evidence clearly demonstrates that, during the time period at issue, Brown was incapable of performing "any job duties" — let alone the essential functions of a Territory Manager.

Brown's claim also fails for a second, independent reason. "Plaintiffs must also propose a reasonable accommodation to succeed." *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 812 (6th Cir. 2020) (Nalbandian, J.) (citations omitted); *see also Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004) (plaintiff "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable"). Brown's "claim must be dismissed if [he] fails to identify and request such reasonable accommodations." *Johnson*, 443 F. App'x at 983. The only accommodation Brown requested during the timeframe at issue was a leave of absence from meeting with customers. Yet Brown repeatedly admits — even in his own Complaint — that MQ granted that request. (*See* Doc. 1, ¶15; *see also* Doc. 27, ¶31; Doc. 17, p. 31, 120:22-121:7.) Nevertheless, the record also establishes that permitting a sales agent to take long leaves of absence on an ongoing basis was not feasible. An essential

part of Brown's job was to maintain regular contact with MQ's new and existing customers, which included conducting in-person meetings, to assess and service their needs. Extended leaves of absence are not compatible with the position unless there is a means for MQ to continue servicing its customers during those absences.

Brown admits that he "did not provide any alternative accommodation[s] during the [July 20th] meeting." (Doc. 27, p. 28; p. 54 at ¶54.) The onus was on him to do so. *See Tchankpa*, 951 F.3d at 812. Nevertheless, Brown argues that he "did not present a reasonable accommodation to Valvano because [] he did not need any additional accommodations for his anxiety as of July 20." (Doc. 27, p. 28; p. 54 at ¶54.) But this argument also fails. Brown required an accommodation. According to his Doctor's order, Brown's disability created long periods during which he would be unable to meet with clients, if not totally incapacitated from servicing them altogether. Regular attention to MQ's clients was an essential part of the sales position, however, and Brown presented no proposal that would reasonably accommodate his prolonged absences while also allowing him to continue servicing MQ's clients. *See, e.g., Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014) ("A suggested accommodation is not reasonable if it requires eliminating an 'essential function' of the job.") (citing 42 U.S.C. § 12111(8)). Brown's failure to suggest any such accommodation is another reason why his failure-to-accommodate claim fails.

Since Brown's failure to accommodate claim fails, his claim for failure to engage in the interactive process also must fail. *Id.* at 1041 ("failure to engage in the interactive process is only an independent violation of the ADA if the plaintiff establishes a prima

16

facie showing that he proposed a reasonable accommodation") (citations omitted). But even if not, there is still no evidence that MQ failed to engage in the interactive process. "An employer has sufficiently acted in good faith when it readily meets with the employee, discusses any reasonable accommodations, and suggests other possible positions for the plaintiff." *Johnson*, 443 F. App'x at 987 (*citing Nance v. Goodyear Tire & Rubber Co.,* 527 F.3d 539, 557 (6th Cir. 2008)). In the days immediately following Brown's panic attack, MQ did each of those things. MQ immediately granted Brown's request for leave (and even gave him paid time off work). Valvano was in near constant communication with Brown and asked to meet with him numerous times. And when Brown finally agreed to meet, Valvano informed him that MQ could create a new position that (hopefully) wouldn't exacerbate his anxiety. MQ was under no obligation to do so. *See Kleiber v. Honda of Am. Mfg., Inc.,* 485 F.3d 862, 868 (6th Cir. 2007) (the duty to engage in the interactive process "does not require employers to create new jobs.") (cleaned up). Nor was MQ even required to propose a counter accommodation. *See Fisher v. Nissan N. Am., Inc.,* 951 F.3d 409, 421 (6th Cir. 2020) (citing *Jakubowski v. Christ Hosp., Inc.,* 627 F.3d 195, 203 (6th Cir. 2010)). Yet MQ still did both. Brown, meanwhile, left the July 20th Meeting without proposing any accommodations. *See Rorrer*, 743 F.3d at 1040 (quoting *EEOC v. Sears, Roebuck & Co.,* 417 F.3d 789, 805 (7th Cir.2005)) ("If [the interactive] process fails to lead to reasonable accommodation of the disabled employee's limitations, responsibility will lie with the party that caused the breakdown.").

17

In fact, MQ's duty to engage in the interactive process may have not even been triggered yet. The Sixth Circuit has "consistently held that an employer is not obligated to provide accommodation until the plaintiff ha[s] provided a proper diagnosis of her disability and requested [a] specific accommodation." *Kirilenko-Ison*, 974 F.3d at 670 (cleaned up) (collecting cases); *see also Tchankpa*, 951 F.3d at 812 ("an employee's failure to provide requested medical documentation supporting an accommodation precludes a failure to accommodate claim."). And there is strong evidence here that Brown did neither.[3]

Regardless, it is clear that MQ engaged in the interactive process in good faith during the days following Brown's panic attack. It is also clear that, if anyone was primarily responsible for the breakdown of that process, it was Brown. *See Fisher*, 951 F.3d at 421 ("If the interactive process was triggered but not successfully resolved, courts should attempt to isolate the cause of the breakdown and then assign responsibility.") (citations omitted).

---

[3] On July 23, 2018, Valvano informed Brown that he "need[ed] to go to the medical field and get a formal diagnosis of the medical condition you are experiencing." (*See* Doc. 18-2.) MQ asserts that the first time it ever received a doctor's note was on September 18, 2018—almost two months later—when Brown's attorney finally emailed a copy to MQ's attorney after repeated requests. (*See* Doc. 17-19 at p. 3.) That note merely stated that "Brown may return to work on 9/24/2018 without any restrictions." (*Id.*) According to MQ, the only other medical documentation it received in 2018 was a second doctor's note on October 8—some two weeks after Brown had already started working for a competitor. (*See* Doc. 17-24.) Brown, meanwhile, claims that he emailed MQ a doctor's note on July 25, 2018. (*See* Doc. 25 at ¶ 25.) However, MQ asserts that the first time it ever saw that note was sometime in November 2020. (*See* Doc. 22 at p. 20-21, fn. 3.) The note was not disclosed during discovery (despite specific requests), Brown testified during his deposition that he had no record of the email he sent and did not produce it until the day of Keith Chabut's deposition. (*See id.*; Doc. 17 at p. 39, 153:5-17; Doc. 17-25; Doc. 30 at p. 5-6, fn. 1; Doc. 19 at p. 2-3, 6:2-7:5.)

## II. Wrongful Demotion (Count I)

In Count I, Brown argues that MQ violated the ADA and Ohio law by demoting him from Territory Manager to the newly created LAE position.

"There are two ways [] a litigant can prove discrimination—directly or indirectly—each with its own test." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018) (cleaned up). Although Brown only needs to prove his claim using one of these methods, *see Hedrick*, 355 F.3d at 453 (6th Cir. 2004) ("direct evidence and circumstantial evidence paths are mutually exclusive"), he argues that he can prove both. MQ, however, contends that he can prove neither. The Court agrees with MQ.

Under either test—direct or indirect—Brown must demonstrate that he is "otherwise qualified for the position." *See Fisher*, 951 F.3d at 417 (outlining direct evidence framework); *Ferrari v. Ford Motor Company*, 826 F.3d 885, 891-92 (6th Cir. 2016) (outlining prima face case under indirect evidence framework). "[T]o overcome summary judgment," Brown "must [therefore] identify the specific job [he] seeks and demonstrate that [he] is qualified for that position." *See Nance*, 527 F.3d at 557. Brown again argues that he could return to the Territory Manager position, without accommodation, in late July. This argument fails for the same reasons as discussed above. *See supra* at p. 13-15. Simply put, Brown cannot demonstrate that he was qualified to return to work without accommodation when his doctor was instructing that he was "unable to perform any job duties" and "unable to function with daily activities." (Doc. 17-24, p. 8.) His claim fails for this reason alone.

Brown's claim also fails for a second, even more basic reason. By offering Brown the LAE position, MQ was complying with the ADA—not violating it.

Brown argues that he should have been entitled to return to the same position he had before. Since MQ instead offered him the LAE position (which allegedly paid less), Brown contends that he suffered an adverse employment action. This argument fails for various reasons.

First, Brown was not qualified for the Territory Manager position. Under the ADA, an "employer need not reassign a disabled employee to a position for which he is not qualified." *Hedrick*, 355 F.3d at 457.

Second, although Brown cites EEOC Guidance in support of his position that MQ should have been required to return to his *same* position, the Sixth Circuit has held that, "in order to satisfy its duty under the ADA, an employer is only required to transfer an employee to a position *comparable* to the employee's prior position." *Id.* (emphasis added). And contrary to Brown's assertions, the evidence indicates that he would have received at least comparable pay in the LAE position than he did as a Territory Manager—if not more. MQ proposed a salary of $105,000. This was significantly higher than Brown's original base salary of $83,000, but less than what he earned (on average) during the three months he worked fully on commission ($12,071 per month). However, while Brown may have continued to earn $12,071 per month or more, due to the nature of working fully on commission, he may have also earned significantly less. Moreover, MQ had planned to discuss a commission plan for the LAE position with Brown "that would enable him to earn the same amount he was making in the sales

role, or even more." (*See* Doc. 20.) MQ never got the chance since Brown refused to meet with them.

Third, even if the LAE position did, in fact, pay less, Brown's claim still fails. The ADA explicitly states that a "reasonable accommodation" may include "job restructuring" or "reassignment to a vacant position." 42 U.S.C.A. § 12111(9). Indeed, the "regulations instruct that employers '*should* reassign the individual to an equivalent position, in terms of pay, status, etc., *if the individual is qualified*, and if the position is vacant within a reasonable amount of time.'" *Hedrick*, 355 F.3d at 457 (citing 29 C.F.R. pt. 1630, App. § 1630.2(o)) (emphasis added). But as discussed now repeatedly, Brown was not qualified to return to the Territory Manager position on July 23rd. And there were no vacant positions available. Under such circumstances, the Sixth Circuit has held that, "if the employee cannot be accommodated in the current position and a comparable position is not available," the "employer may reassign an employee to a lower grade and paid position." *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998). "In fact, where a comparable position is not vacant, an employer's obligation to reassign an employee *may include* an assignment to a position with a lower grade of pay." *Hedrick*, 355 F.3d at 457 (emphasis added). Furthermore, MQ was under no obligation to create a new position for Brown. *Smith v. Ameritech*, 129 F.3d 857, 867 (6th Cir. 1997) ("The ADA does not require employers to create a new position for a disabled employee who can no longer perform the essential functions of his job.") But MQ did so anyways. They offered Brown the newly created LAE position. This was a reasonable accommodation—not a wrongful demotion. And "an employee cannot

21

make his employer provide a specific accommodation if another reasonable accommodation is instead provided." *Hedrick,* 355 F.3d at 457; *see also Trepka v. Bd. of Educ.,* 28 Fed.Appx. 455, 459–60 (6th Cir. 2002) (since "the employer retains the 'ultimate discretion' to choose another effective accommodation. . . an employee is not entitled to a particular reasonable accommodation if another reasonable accommodation is provided.").

And regardless, how could Brown have been demoted when he never actually accepted the position? *See Hedrick,* 355 F.3d at 457-58 ("although an employee is not required to accept an offered accommodation, if an individual rejects a reasonable accommodation, the individual will no longer be considered a qualified individual with a disability.") (*citing* 29 C.F.R. § 1630.9(d)).

In sum, the fact that the LAE position *may* have paid less is irrelevant. MQ did not violate the ADA by *offering* to reassign Brown to a newly created—albeit lower grade and lower paid—position since (1) he could not be accommodated in his current position and (2) there were no vacant positions available. *See, e.g., Cassidy,* 138 F.3d at 634; *Hedrick,* 355 F.3d at 457-58. Under these circumstances, Brown's "transfer to the [LAE] position could in no way be construed as a violation of the ADA." *See Nance,* 527 F.3d at 557. For, "although [Brown] may have personally believed that [he] was overqualified for the position and that the salary was too low, [MQ] satisfied its obligation under the ADA by offering a reasonable accommodation when it made the [LAE] position available to [him]." *See Hedrick,* 355 F.3d at 458. MQ is not liable simply because Brown did not find the new position desirable.

III.    **Wrongful Termination (Count II)**

MQ next contends that it is entitled to summary judgment on Brown's wrongful

termination claim (Count II) because Brown cannot establish a prima facie case.  MQ's

argument is three-fold.

First, MQ argues that Brown was never terminated and thus suffered no adverse

employment action.  But on this record, that is the jury's call, not the Court's.  *See Gunter*

*v. Bemis Company, Inc.*, 906 F.3d 484, 488 (6th Cir. 2018) (Sutton, J.).  As a refresher, on

August 13th, Brown received the following email from MQ's president, Keith Chabut:

> Darren,
> Your next payroll check will reflect the remaining (1) day of vacation and (1) day
> of sick pay.  Dean Valvano will be calling you to arrange the retrieval of
> company property laptop, account files, catalogs, etc.[,] given the need to move
> our business forward.
> Sincerely,
> Keith.

(Doc. 17-15.)  In other words, after mental health issues forced Brown to be out of the

office and unable to work for close to a month, he received an email from the company

president informing him that his supervisor "will be calling you to arrange the retrieval

of company property . . . given the need to move our business forward."  (*Id.*)  Based on

this email, a reasonable juror could find that MQ was terminating Brown's

employment.

Second, MQ argues that Brown lost his status as a qualified individual by

refusing to accept the newly created LAE position.  Indeed, the Sixth Circuit has held

that "if an individual rejects a reasonable accommodation, the individual will no longer

be considered a qualified individual with a disability."  *Hedrick*, 355 F. 3d at 457-58

(*citing* 29 C.F.R. § 1630.9(d)).  But the evidence on record indicates that MQ didn't know Brown had rejected the position until sometime in late September 2018.  (*See* Doc. 20, ¶12, ¶33; Doc. 27, ¶¶98-100; Doc. 17, p. 47-50.)  If a reasonable juror finds that Brown was fired on August 13th, whether he rejected the LAE position a month or so later is irrelevant.

Third, MQ contends that no similarly situated employees outside of Brown's protected class were treated better, and that the Territory Manager position was never filled—let alone by someone outside of his protected class.  However, a material question of fact exists here as well.  Indeed, MQ is correct that it is "settled law in the Sixth Circuit that spreading the former duties of a terminated employee among the remaining employees does not constitute replacement." *Fleming v. Honda of Am. Mfg., Inc.*, 2017 WL 4296314, at *3 (S.D. Ohio Sept. 28, 2017).  But it is also true (as Brown contends) that in the Sixth Circuit, "an employer 'replaces' a discharged employee when it reassigns an existing employee to assume the discharged employee's duties in a way that fundamentally changes the nature of his employment." *Pierson v. Quad/ Graphics Printing Corp.*, 749 F.3d 530, 537 (6th Cir. 2014) (cleaned up).  As such, Brown argues that he was replaced by Anthony Gillespie, who had previously been working as an intern before he graduated in July 2018 and (allegedly) took over Brown's accounts. *See, e.g., Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 522 (6th Cir.1997) (concluding that a part-time employee who was promoted to full-time employment effectively replaced a terminated employee because "[t]his type of reassignment is analogous to hiring a new

employee to cover the terminated employee's duties"). A material question thus exists as to whether Brown's position was filled by someone outside of his protected class.

Since Brown raises genuine disputes of material fact as to each of MQ's three arguments, his claim for wrongful termination survives summary judgment.

## IV. Failure to Accommodate/Engage in the Interactive Process (Count IV)

Lastly, in Count IV, Brown asserts that MQ failed to accommodate his continued requests for leave and failed to engage in the interactive process by terminating his employment on August 13th. This argument fails for the same reasons as Count III. *See supra* p. 13-16. First, Brown cannot demonstrate he was qualified to return to work without accommodation on July 23rd (or even August 13th, for that matter) when his own doctor was instructing that he was "unable to perform any job duties" and "unable to function with daily activities" until a full two months later. Second, the only reasonable accommodations Brown ever requested were granted. On July 23rd, Brown requested additional time off, which was granted. (Doc. 27, ¶ 59.) On July 29th, Brown applied for Short Term Disability, which was granted. (*Id.*, ¶ 75.) On July 30th, Brown requested additional time off, which was granted. (*Id.*, ¶ 73.) And while Brown expressed desire in returning to his old position, such a request is objectively unreasonable in light of Brown's medical restrictions.

Lastly, Brown's coinciding failure to engage in the interactive process claim fails as well, for the same reasons as Count III. *See supra* p. 16-18. First, Brown cannot proceed with such a claim when his underlying failure to accommodate claims fails. *See Rorrer*, 743 F.3d at 1041. Second, the evidence demonstrates that MQ engaged in the

interactive process in good faith. As discussed above, MQ readily met with Brown (or at least tried to meet with him); discussed reasonable accommodations (*e.g.*, time off work); and suggested other possible positions for him. *See Johnson*, 443 F. App'x at 987. MQ was under no duty to create a new position for Brown, yet they did so anyway. And generally, "an employer is not responsible for a breakdown in the interactive process unless the employer actually failed to offer a reasonable accommodation." *Kirilenko-Ison*, 974 F.3d at 669. Moreover, "[a]n employer cannot be found to have violated the ADA when responsibility for the breakdown in the informal interactive process is traceable to the employee and not the employer." *Kleiber v. Honda of Am. Mfg. Co.*, 420 F. Supp. 2d 809, 828 (S.D. Ohio 2006) *aff'd by* 485 F.3d 862 (6th Cir. 2007). Yet that is precisely what happened here. Apart from asking for time off work, Brown failed to propose a reasonable accommodation; failed to provide any counter accommodations to the LAE position; failed to provide requested medical documentation; and, at times, was difficult to even get a hold of. In fact, Brown admits that he received a job offer letter from a competitor on August 29, 2018 . . . peculiar timing indeed. If anyone is to blame for the breakdown in the interactive process, it is Brown, not MQ.

**CONCLUSION**

For the reasons above, MQ's motion for summary judgment (Doc. 22) is

**GRANTED IN PART** and **DENIED IN PART**. MQ is entitled to summary judgment

on Brown's claims for wrongful demotion and failure to accommodate/ engage in the

interactive process. Counts I, III, & IV are therefore **DISMISSED WITH PREJUDICE**.

Brown's claim for wrongful termination (Count II) remains pending before the Court.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____

JUDGE MATTHEW W. McFARLAND